COMMISSIONER OF BANKING *v.* BERRY

1. BANKS AND BANKING—INSOLVENCY—DEFINITION.

A bank is insolvent within the meaning of the financial institutions act when it has liabilities that exceed the fair market value of its assets (MCLA § 487.115).

2. BANKS AND BANKING—INSOLVENCY—LEGISLATIVE INTENT.

The "insolvency" ground for appointment of a receiver for a bank under the financial institutions act was intended by the legislature to mean something in addition to, and distinct and different from, the ground of "a refusal to pay its deposits or obligations in accordance with the terms under which such deposits or obligations were incurred" (MCLA § 487.115).

3. BANKS AND BANKING—FDIC—RECEIVER—STATE LAW.

The Federal Deposit Insurance Corporation is qualified under state law to be appointed a receiver of a state bank (MCLA 1970 Cum Supp § 487.551).

4. BANKS AND BANKING—FDIC—RECEIVER—FEDERAL LAW.

The Federal Deposit Insurance Corporation has general powers under Federal law to act as receiver of a bank (12 USC 1819[9]).

5. BANKS AND BANKING—RECEIVER—APPOINTMENT—DUE PROCESS.

Provision of the financial institutions act for the *ex parte* appointment of a receiver upon application of the commissioner of banking, with provision for a later hearing at which

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 10 Am Jur 2d, Banks § 755.
[3–5] 10 Am Jur 2d, Banks § 763 *et seq.*
[6] 10 Am Jur 2d, Banks §§ 765, 774.
[7] 46 Am Jur 2d, Judges §§ 230–232.

objections may be made is not violative of the constitutional right of due process.

6. BANKS AND BANKING—RECEIVER—SALE OF ASSETS—DUE PROCESS.

Sale of the assets of a bank in receivership by the receiver on an *ex parte* order of the court to avert impending catastrophic failure of a large state bank and thereby to protect its uninsured depositors is not violative of the constitutional right of due process.

7. JUDGES—DISQUALIFICATION—RELATIONSHIP.

Technical disqualification of a circuit judge which arose when he appointed a law firm of which his son-in-law was a member as one of two legal representatives of a receiver of a bank, but after he had found that the bank was insolvent and appointed a receiver, was not sufficient to overturn approval by the judge of a sale of the bank's assets according to an agreement already approved by the bank's directors before the disqualification arose.

Appeal from Wayne, Blair Moody, Jr., J. Submitted Division 1 June 19, 1970, at Detroit. (Docket Nos. 4,629 and 4,630.) Decided October 8, 1970.

Statutory action by the commissioner of banking to place the Public Bank, a Michigan banking corporation, in receivership. Judgment that the commissioner appoint a receiver for the Public Bank. The Public Bank, its directors in their capacity as shareholders, and the Public Bank Shareholders Association appeal. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Maurice M. Moule* and *James J. Wood,* Assistants Attorney General, for plaintiff.

*David M. Miro (Jeffrey H. Miro,* of counsel), for the Public Bank and its directors.

*Goldstein, Schlussel & Lifton,* for the Public Bank Shareholders Association.

*Honigman, Miller, Schwartz & Cohn (John Sklar,* of counsel), and *Miller, Canfield, Paddock & Stone (Peter P. Thurber,* and *George E. Parker III,* of counsel), *Leslie Fisher,* General Counsel, and *J. Lovering Truscott,* Assistant General Counsel, for the Federal Deposit Insurance Corporation, receiver for the Public Bank.

*Parsons, Tennent, Hammond, Hardig & Ziegelman,* for the Bank of the Commonwealth.

Before: QUINN, P. J., and V. J. BRENNAN and BRONSON, JJ.

PER CURIAM. The two appeals involved were consolidated for purposes of appeal by an order of this Court dated February 20, 1969. Each appeal arose from the same lower court proceeding, namely: the grant of the petition of the Michigan commissioner of banking for the appointment of a receiver for Public Bank, a Michigan banking corporation. Our file No. 4,629 is the appeal of Public Bank Shareholders' Association and our file No. 4,630 is the appeal of the individual defendants. For a variety of reasons, discussed in detail subsequently, the appeals attack the grant of the petition, the propriety of appointing Federal Deposit Insurance Corporation as receiver, and the sale and transfer of the assets of Public Bank to Bank of the Commonwealth by the receiver.

Our review of the actions of the trial court here under attack must be in context with the facts

presented to that court. In its written opinion, the trial court made detailed findings of fact, none of which are clearly erroneous (GCR 1963, 517.1), and our review of the record does not convince us that we would have found differently had we sat as triers of the fact. These findings establish the following:

Public Bank was a state bank chartered under Michigan Financial Institutions Act. Public Bank was not a member of the Federal Reserve System, but was insured with FDIC and subject to examination by it, as well as the state banking department.

From 1961, the state banking department was concerned with the operation of Public Bank. In 1963, the accounting department manager of Public Bank took exception with his superiors as to certain accounting methods employed by the bank. He questioned the handling of unearned income, a switch of accounting methods relating to unearned interest on installment loans, and he objected to the transfer of approximately $500,000 from the unearned interest account to the undivided profits account. Again in 1965, this same accounting officer questioned the handling of the unearned interest account, the renewal of consumer loans and the establishment of loss reserves pertaining to home improvement contracts purchased by the bank. These objections were voiced to several officers and directors of the bank.

In September of 1965, an officer of Public Bank brought to the attention of the state banking commissioner the method by which the bank handled the unearned interest account. During the fall of 1965, a Federal grand jury investigated Public's

accounting methods, especially those relating to the unearned interest account. This was a topic of discussion between the banking commissioner and officers and directors of Public during September and November of 1965.

Shortly prior to November 3, 1965, the secretary of Public Bank advised the directors of the bank that an initial accounting run had been made reflecting a deficiency in the unearned income account of $1,509,000 which would reflect in an overstatement of earnings. Such initial run was disputed and required further detailed checking in the opinion of other officers of the bank. At the November 3 meeting of the board of directors, the state banking commissioner requested an audit of the unearned interest account to determine any deficiency. There were substantial differences of opinion as to the most prudent method for accounting appropriately to reflect whether there was any deficiency. Shortly after this November 3rd meeting, the president of Public Bank, Mr. Hay, resigned effective November 30, 1965.

Soon after this meeting, the board of directors employed Touche, Ross, Bailey & Smart to conduct an audit of the unearned interest account. This audit resulted in a written opinion from the accountants which used three methods in reviewing the bank's computations of unearned interest. Under each method a deficiency in unearned interest and an overstatement of profits was disclosed in amounts of approximately $1,835,000, $2,045,000 and $1,485,000, according to the method employed.

December 22, 1965, Ernst & Ernst were employed to review the findings of Touche, Ross, Bailey & Smart. Ernst & Ernst made no examination or

audit of accounts but in a letter opinion as of December 28, reviewed the method used by Public in recognizing income on installment loans. This report reflected that Public since approximately 1962 had been recognizing income on installment loans on an "average yield method", leaving in a deferred income account an amount approximately equal to ten or eleven per cent of the outstanding balance of the installment loans. Such practice according to the Ernst & Ernst report was "reasonable and similar to the practice followed by other banks". This report also suggested that such interest earned on installment loans be reflected on a 78ths method in the future and proposed that such change be made after January 1, 1966. The opinion of Ernst & Ernst concluded that the present method be continued on the books through December 31, 1965, to avoid "an abnormal adjustment as of December 31, 1965, which might have serious effect on the bank's image in the financial community".

At a meeting held December 28, 1965, the board of directors considered the reports from both firms of accountants and adopted the recommendations of Ernst & Ernst. A resolution was adopted continuing the existing policy of computing earnings on installment loans through December 31, 1965, and providing that starting on January 1, the 78ths method be used for all new installment loans. The officers of the bank were instructed to advise interested state and federal officials of this resolution.

Walter F. Finan was elected president and director of Public Bank following the resignation of Mr. Hay. At a meeting held January 6, 1966, Mr. Finan read a prepared statement relating to the handling

of the unearned income account. The statement expressed his position that if Public did not follow the practices recommended by Touche, Ross, Bailey & Smart or make a full proper footnote to the December 31 statement as Touche, Ross, Bailey & Smart might recommend, Mr. Finan would submit his resignation. According to the statement, the books of Public Bank did not properly reflect the true condition of the bank because the unearned income on installment loans was understated and its earned income overstated. Mr. Finan recommended that an immediate cure should be effectuated either by suitable bookkeeping entries prior to the closing of the books of account for the year 1965, or by causing suitable footnotes to be made to the year-end report for 1965. Mr. Finan's resignation was accepted at this meeting.

At a board of directors' meeting held January 10, 1966, the footnote suggestion was adopted, and the statement of condition of the bank as of December 31, 1965, contained a footnote which indicated a reduction in undivided profits of approximately $1,500,000. At this meeting, it was also determined to amortize this deficiency over a period of years by charging it to current earnings computed on the 78ths method. The first amortization entry was made on Public's books in March of 1966. This was reflected in the statement of condition as of April 5, 1966, and neither the state banking department nor FDIC objected to this procedure.

FDIC and the state banking department began separate examinations of Public Bank March 28, 1966, which continued until June 10, 1966. A summary of the FDIC report of this examination stated:

"In spite of repeated criticisms of supervisory authorities and field examiners, management has continued to expand the loan account far beyond accepted banking standards, has continued to extend credit to financially weak borrowers, has continued to extend credit in excessive concentrations to a few borrowers and their interests, has failed to adhere to the basic principles of sound banking of maintaining a normal risk diversification, has continued its weak lending policies, has not formulated a reasonable collection policy, has continued to grant loans with inadequate credit information, has failed to maintain the credit files in a current and satisfactory condition, has failed to effect reasonable recoveries on charged-off assets, has continued to operate the bank with an inadequate capital account, has failed to recognize operational expenses, has overstated income, has permitted excessive losses in the loan account, has repeatedly disregarded provisions of law and regulations, and has not provided the officer personnel necessary for the supervision of the large loan account which is filled with serious problems.

"Although the board has been repeatedly reprimanded for these deficiencies, it is apparent from the findings of this examination that it has failed to effect corrections and the present condition of the bank discloses that the problems have become more acute and seriously threaten depositor funds."

The report of the state banking examiner contained the following:

"This examination discloses that subject bank is faced with many monumental problems for which there are no easy or readily apparent solutions. Bank has had a troubled history, and the major

perplexities now facing the bank center around new, and unresolved asset problems of the past, and management's failure to provide sound earnings, the cumulative effects of which are now endangering the solvency of this institution. Despite the combined past efforts of supervisory personnel to point up dangerous deficiencies and inherent weaknesses, bank's board of directors have initiated few corrections. The more important areas in which the bank has continued to be deficient are outlined below, with detailed comments following:

"(1) *Loans and Discounts:*

"(a) Maintenance of an excessive loan volume.

"(b) Excessibe concentrations of credit and lack of diversification relative to individual borrowers, and also with regard to type and source of loans.

"(c) Excessive loan classifications and delinquency.

"(d) Excessive loan losses and an unsatisfactory recovery record.

"(e) Failure to provide for an adequate senior loan staff to grant and properly service an expanded loan portfolio.

"(2) *Earnings:*

"Failure of the bank to generate sound earnings, which are essential to the buildup of adequate loss reserves and maintenance of a strong capital account.

"(3) *Capital Structure:*

"Failure to maintain an adequate capital account in relation to the deposit structure.

"(4) *Liquidity:*

"Continued operation of the bank with low liquidity, particularly pronounced at this examination."

Contributing to the foregoing criticisms of the bank's condition at the time of this examination were the following facts:

a. From October 1, 1964, to December 31, 1965, Public purchased $29,264,584.21 worth of home-improvement contracts from two sources. From February 15, 1965, through March 28, 1966, the amount of such purchases from one of these sources more than doubled. Generally, the first payment on such contracts fell due several months in the future and a large number of these contracts purchased late in 1965 provided no income for 1965. The 1965 year-end statement of the bank disclosed that 95% of the earnings from home-improvement loans was attributable to two sources.

b. In 1963, the percentage of loans to total assets was 60.3%. This percentage rose to 71.6% by March 28, 1966. During the same period, the loan to deposit ratio rose from 67.1% to 82.1%. In 1965, the state average for this ratio was 59.2%.

c. Between December 31, 1965, and March 28, 1966, the bank lost deposits of nearly $14,000,000 and suffered a net loss of $440,252.58, which included a $178,155 amortization of the previous deficiency in unearned income.

d. The March 28, 1966, examination revealed that loans from five sources had grown to 722.3% of the bank's total capital and surplus account and represented 50.4% of the total loan portfolio. The examination also disclosed that over $35,000,000 of $51,755,588.88 of installment loans were obtained from two sources and that 95.1% of the home-improvement loans had been purchased from these two sources.[1]

e. On this examination, 46.6% of the bank's total loan portfolio was adversely classified as loss,

---

[1] It is noted that a director of Public was affiliated with one of these sources.

doubtful or sub-standard. The total of the loans classified adversely was six times the total book capital structure of Public Bank. A loan classified as a loss is charged against the capital account and 50% of a loan classified as doubtful is similarly charged. The percentage of loans classified adversely rose from 21% in 1963 to 46.6% on March 28, 1966. During the same period, the percentage of adversely classified loans to book capital rose from 199.9% to 637.6% and the percentage of loans classified as loss or doubtful to book capital rose from 14.9% to 52.3%.

The FDIC report of examination also contained the following:

"A check of the files discloses the lack of credit worthiness on the very great majority of the borrowings with borderline and weak credits predominating. A review of the past charge-offs in these accounts reflects the deterioration in the quality of the contracts purchased, as the amounts that are being charged off are increasing at a faster pace than the increase in the acquisitions indicating that probable losses still can reasonably be expected to increase further, resulting in staggering charges against capital funds. The loss reserves that were being built up when the accounts were increasing have all been used, and, as the bank has for all practical purposes shut off new acquisitions, there will be little, if any, reserve to absorb the losses that are still to be taken and the charge-offs will have to be out of capital funds.

\* \* \*

"Due to the time lag of approximately a year before the contracts become statutory, the losses for most of 1965 and the first quarter of 1966 have

not come to light at this time, since nearly all of the contracts have a delayed first payment of from six to eight months from origination date, after which they do not become statutory until payments are six months past due."

In a similar vein, the state examination report stated, "to date the bank has experienced a punishing loss experience on home improvent loans from the two sources". Accordingly, the examiner placed a group classification of "doubtful" to $5,000,000 of such loans causing $2,500,000 to be charged against the capital account. This statement concluded:

"there is little doubt that the ultimate losses that will be suffered will far exceed the $2,500,000 that is charged against the capital account * * * and it is more probable that a loss classification of $5,000,000 would have been more appropriate. Likewise, as a group these loans are not considered to represent sound banking values and a substandard classification is accorded all the remaining contracts".

These comments in the reports of examination are supported by the following:

a. Delinquency in the loan account was 10.2% and in the installment loan category 13.1%, more than twice the state average. To keep the delinqency ratio at this level, loans were rewritten or their maturities were extended.

From January 1963, to March 28, 1966, Public experienced a net loss of $318,134.91. As of May 31, 1966, Public had sustained a total book loss of $790,780.67 in spite of $360,000 advanced by the directors to purchase $900,000 of charged-off home improvement loans which reduced the loss in that

category to approximately $540,000. The state examination report stated:

"Except to the extent that new deposit money can be attracted, bank will have little reinvestment ability for the remainder of the year. Bank will have a significantly frozen asset condition for many months due to the long-term liquidation provisions that are built into the major block of its earning assets, and any conceivable run off that will be experienced for the remaining months of 1966 will be needed to reduce the excessive loan deposit ratio, and provide for a minimum acceptable level of liquidity.

"The earnings prospects for year 1966 are indeed grim, and it is quite probable that the net deficit for the year will greatly exceed the very substantial true deficit that was experienced in 1965. Bank is faced with the task of liquidating (without benefit of remaining reserves) in excess of $35,000,-000 of sub-marginal loans which can reasonably be expected to produce additional losses running several hundred thousand dollars by year end."

The charge against capital of adversely classified loans and the deficiency in unearned discount reduced the book capital account of $6,216,870.62 to an adjusted capital account of $1,474,184.37. The latter sum represented 1.18% of the quarterly average of all assets of Public Bank. The average state ratio of capital to assets as of October 13, 1965, was 8.01%. By letter dated June 28, 1966, the state banking commissioner required the directors to assess stockholders $12.44 per share to restore the deficiency in the capital account. This demand was repeated July 19 to be accomplished within two months, but it was never complied with.

In February 1966, Public had to sell $12,481,000 of United States notes and bonds at a book loss of $175,117.40 and also obtained a line of credit from a New York correspondent. The liquidity ratio to deposits was 27.17%, approximately 10% lower than at the time of the 1965 examination. At the time of examination, Public's group I and group II securities showed a market depreciation of $1,004,991.05. The FDIC report of examination contained the following:

"Of further concern is the fact that there is a market depreciation of $1,004,991.05 in the securities account which is not reflected in the computations to arrive at the adjusted capital account. Should the bank again be faced with the problem of liquidating assets to meet depositors' demands, as was necessary after the first of the year due to unfavorable publicity, the bank would be threatened with the prospects of additional punishing losses from the sale of securities to meet these demands, which would further deplete the already impaired capital account.

"Of grave concern is the effect that the present trend in the earnings will have on the capital account, since the deficit is growing month by month in substantial amounts, which is further reducing total capital accounts. The overhanging threat of pending losses in  *  *  *  (the two sources of installment paper), which will henceforth have to be charged against capital funds, is cause for serious doubts as to the ability of the bank to cover the expected losses."

June 6, 1966, the directors of Public Bank met with the state banking commissioner, his examiner and certain personnel from FDIC to review the nearly-completed examinations. The commissioner

requested the board to take positive steps with regard to correcting the capital account deficiency. The board indicated it would attempt to obtain additional capital from shareholders, put out feelers for a merger or explore the sale of stock to an outside investor. At this same meeting, the FDIC examiner stated he would recommend the issuance of a citation under section 8(A) of the Federal Deposit Insurance Act reflecting unsafe and unsound practices. This citation was issued July 26, 1966, with the following specific findings:

"1. The continued operation of the bank in an unsound and hazardous condition with a seriously impaired capital account, the impairment at the close of business on March 28, 1966, being such as to exhaust entirely the bank's undivided profits and surplus and to impair its common stock substantially;

"2. The continued operation of the bank with an adjusted capital account which is inadequate in relation to the kind and quality of assets held by the bank;

"3. The continued pursuit by the bank of lax credit, lending and collection policies and practices, including but not limited to (a) the carrying of an excessive volume of adversely classified loans, (b) the carrying of an excessive volume of loans, (c) the failure to diversify the loan portfolio, (d) the carrying of excessive concentrations of credit, (e) the failure to take aggressive and effective action to collect problem loans, including charged off loans, (f) the carrying of an excessive volume of overdue loans, and (g) the maintenance of deficient credit files;

"4. The continued failure of the directors of the bank to provide an adequate loan administrative staff;

"5. The continued failure of the directors and officers of the bank to exercise proper control over income and expenses and accounting procedures of the bank, as a result of which the bank's reported earnings have been overstated and some of its expenses understated;

"6. The continued failure of the directors and officers of the bank to observe and comply with, and their knowingly or negligently authorizing or permitting violations of provisions of law to which the bank is subject, including sections 74 and 91 of the Michigan Financial Institutions Act;

"7. The continued failure of the directors and officers of the bank to heed the criticisms and warnings and to comply with the recommendations of this corporation and the Michigan State Banking Department and their respective examiners."

The 8(A) citation specified the following corrective measures to be completed within 120 days (November 28, 1966) or steps would be taken to terminate Public's status as an insured bank:

"1. Charge off all assets classified as loss on its accounting statements;

"2. Charge off at least 50% of its assets classified as doubtful on its accounting statements;

"3. Proceed diligently to eliminate the remaining 50% of doubtful assets and reduce by at least 50% the substandard assets on its accounting statements;

"4. Reduce the volume of large concentration of credit and diversify the loan portfolio;

"5. Provide additional experienced loan administrators at the executive level;

"6. Make appropriate entries to correctly reflect interest collected but not earned;

"7. Place the assets of the bank in a form and condition acceptable to the commissioner and the FDIC and that the bank provide an adjusted capital account not less than $6,216,870."

July 28, 1966, the state banking commissioner extended the time for the assessment of Public shareholders to November 28, 1966, on three conditions:

"1. That a written plan for correction of the capital impairment be provided to the commissioner's office within 10 days;

"2. That reports be submitted to the commissioner's office on the first and fifteenth day of each month beginning August 15, 1966, concerning progress on the corrected measures required by the FDIC, and;

"3. That a signed copy of the general ledger, daily statement of bank be submitted to the commissioner's office each day for the previous day's close of business effective immediately."

The first condition was never met.

Prior to October 11, 1966, neither the officers nor the directors gave the shareholders any notice of the assessment or of the 8(A) citation.

During the spring and summer of 1966, Public initiated some corrective measures including hiring new experienced personnel, attempting to reduce the installment loan portfolio, not purchasing more home improvement installment loans and attempting to increase deposits. Merger or recapitalization were discussed with Mr. Leemon, president of Guardian Savings and Loan Association and the state banking commissioner. Some discussion was had with Michigan Bank relative to merger. Pub-

lic and City National Bank entered into a merger agreement conditioned on review of assets and audit of Public. City National later withdrew from this merger agreement. A proposal for recapitalization was made by director Mebus. No merger or recapitalization was accomplished.

August 22, 1966, the State Banking Department and FDIC placed examiners in Public Bank where they remained until October 11, 1966, documenting on a daily basis information on Public's condition.

The chairman of the board of FDIC visited Detroit during the week of August 21, 1966, and called on five of six banks relative to Public's problem and possible solutions therefor. City National Bank was not visited due to its prior withdrawal from a proposed merger agreement. National Bank of Detroit and Detroit Bank and Trust Company evidenced no interest in merging with or acquiring Public. Michigan Bank indicated its awareness of community responsibility and that it would join other banks in assisting Public. Manufacturers National Bank proposed a possible acquisition pro vided FDIC placed with Manufacturers a $25,000,000 liquidity deposit and guarantee Manufacturers against losses without limit as to amount. FDIC doubted it could do so legally and nothing further developed with Manufacturers Bank. Bank of the Commonwealth expressed an interest in acquiring Public if FDIC provided sufficient assistance. Officials of Commonwealth expressed concern for the impact on Commonwealth if Public failed. Near the end of August 1966, Commonwealth and Public began negotiations for the purchase of Public by Commonwealth. The latter engaged Touche, Ross, Bailey & Smart to examine Public and the resulting

report formed a basis for negotiating and for limiting assistance by FDIC. An initial agreement was reached August 29, 1966, and it was signed by directors McGuire, Moorman, Kotcher, Mebus, Sr., Granader, Youngblood, Meldrum, Harris, Burke, and Tunney.

Commonwealth and Public negotiated a formal agreement dated September 1, 1966. It provided a premium to Public of $550,000 for the latter's going concern value and the right of Commonwealth to do business at Public's banking house branch locations plus a two per cent premium on demand deposits and a one-half of one per cent premium on all other deposits. This agreement was approved at a board of directors meeting and it was signed by the following directors of Public: McGuire, Burke, Mebus, Sr. and Jr., Kotcher, Meldrum, Benway, Moorman and Harris. Philip Mebus, Sr., the largest individual shareholder of Public, not only approved and executed the sale agreement but he further agreed to execute and deliver to Commonwealth an irrevocable proxy by himself and each member of his family to vote for confirmation and approval of said agreement.

Shortly after the agreement of September 1, 1966, the FDIC and Commonwealth began negotiations which eventually culminated in two agreements, being agreement A and agreement B of September 19, 1966. Agreement A was a support agreement for the agreement between Commonwealth and Public dated September 1, 1966, and it reflects the method of appraising assets and recognizing liability of Public for the purpose of measuring Commonwealth's right to charge the FDIC $10,000,000 guaranty fund established under agreement A. Agree-

ment B was a standby agreement relating to the method of appraising assets and recognizing liabilities in the event FDIC should be appointed receiver for Public and a court approved a sale by the receiver to Commonwealth. Agreement B also embodied a $10,000,000 guaranty fund from FDIC. Agreement A contemplated a direct purchase by Commonwealth from Public with Public stockholder approval. Agreement B contemplated a similar acquisition but through the route of involuntary receivership with court approval. After the execution of agreements A and B, Commonwealth officials executed the agreement between Public and Commonwealth dated September 1, 1966. Agreement B was initiated at the insistence of FDIC as an alternate route to effectuate the continued operation of Public in case agreement A failed to become effective. On September 30, 1966, but effective September 23, 1966, Commonwealth and Public amended their September 1 agreement so that it was exactly parallel to the terms of sale under the contingent receivership agreement, agreement B, except for a 15-day difference as to the time for calculating the premium on deposits. The amended agreement was approved at a special meeting of the board of directors of Public on October 3, 1966, with the following directors approving the amendment: Benway, Burke, Granader, Kotcher, McGuire, Mebus, Jr., Meldrum, Moorman, and Tunney. Director Berry abstained from voting and Mebus, Sr., and Youngblood were absent. Agreement B excuses performance by Commonwealth in the event that a break in normal business operations occurred in Public Bank.

In the event Public was able to obtain a better offer than that made by Commonwealth, the latter

agreed to step aside. The president and board of directors of Public knew the details of agreements A & B and that the latter contemplated the sale of Public by a receiver without interruption of Public's banking operations. Public's president expressed relief that under either agreement Public depositors would be fully protected. Approximately $10,000,000 of deposits in Public were not insured.

A public announcement of a Commonwealth-Public merger was made September 23 to September 26, 1966, including FDIC's participation therein. By agreement and law, Public shareholder approval was required for the sale of Public to Commonwealth. A proxy statement had to be furnished to Public shareholders prior to the meeting at which such approval was sought, and FDIC had to approve the proxy statement.

The original closing date for the sale of Public to Commonwealth was October 3, 1966. Disagreement developed between Public's management and its accountants, Touche, Ross, Bailey & Smart, as to the contents of the proxy statement, especially as to an appropriate loss reserve. The closing date was changed to October 14 and Public amended its bylaws to shorten the required notice to shareholders from ten to seven days. No acceptable proxy statement was available October 7 and no extension of the October 14 closing date was secured. Touche, Ross, Bailey & Smart withdrew from the preparation of the proxy statement October 11. Public's board of directors resolved to hold a shareholders' meeting October 14 and to then advise them of the bank's condition.

The following facts indicate the worsening of Public's condition during the period of negotiations with Commonwealth:

a. Of the deposit loss of over $21,500,000 between October 7, 1965, and October 7, 1966, almost $2,500,-000 occurred between September 20, 1966, and October 7, 1966.

b. August 26, 1966, Public had insufficient funds to meet its clearings and borrowed $500,000 from Federal Reserve in order to do so. On the same date, a second $500,000 was borrowed from Federal Reserve to cover a large deposit withdrawal.

c. This borrowing from Federal Reserve to maintain liquidity requirements without selling government securities continued on a daily basis from August 26 to October 11, and on the latter date these borrowings attained a total of $9,500,000.

d. As of October 11, Public's book capital account was $936,116.01 and deposits were $92,952,642, resulting in a capital to deposit ratio of about one per cent. Loans against these deposits approximated $81,500,000, producing a loan to deposit ratio of almost 88%, 6% higher than on March 28, 1966. The installment loan portfolio was almost $46,000,-000, of which $31,550,000 was submarginal. The liquidity ratio to deposits had declined to 19.1% from the low ratio of 27.17% on March 28, 1966.

e. Based on market value of securities, as opposed to amortized cost which is the normal method of valuing a bank's securities, Public's liabilities exceeded its assets by $1,362,779.20 as of October 11, 1966.

f. Public's statement of condition prepared September 20, 1966, was never published, a source of comment in Detroit's financial community.

Concerned by all these developments, several weeks prior to October 11 the banking commissioner

requested the attorney general to have a petition for appointment of a receiver for Public in readiness. The Attorney General conferred with the Wayne County Presiding Judge relative to the possible necessity for filing such a petition and having an immediate hearing thereon after normal court hours. The Presiding Judge pro tem. joined this consultation and by lot, Judge Burdick was assigned the case in the event it was filed. Arrangements were made with Judge Burdick to hold a hearing after normal court hours, if the petition was filed.

Although on October 11, 1966, Public met its obligations in the ordinary course of business and did not refuse to pay its deposits or obligations in accordance with the terms under which said deposits or obligations were incurred, met and satisfied its bank clearings as of that date and had on deposit with its clearing house representative sufficient funds to meet and satisfy its clearings on that date, the banking commissioner filed his petition for the appointment of a receiver for Public Bank on the basis of its insolvency at 5:30 p.m. on October 11, 1966. No notice of the petition or of the hearing was given to any officer or representative of Public and only court personnel, representatives of the State Banking Department, of FDIC, Commonwealth, their respective attorneys and persons associated with them were present at such hearing.

The hearing concluded in the early morning hours of October 12. Judge Burdick found that Public was insolvent and appointed FDIC receiver with authority to take possession of and liquidate Public's assets. The judge appointed counsel for the receiver

and the receiver presented its petition for the immediate sale of Public to Commonwealth pursuant to agreement B. This petition was granted under an order containing a defeasance provision or condition subsequent under which all interested parties considering themselves aggrieved by the order were directed to appear November 2 and show cause why the order should be set aside. Thereafter, the president of Public was advised of the proceedings, FDIC took possession of Public, sale to Commonwealth was consummated, Commonwealth took possession and reopened the bank for business at the normal time on October 12. Copies of all orders and the sale agreement were subsequently mailed to Public shareholders.

On November 2, a preliminary hearing was held to develop a plan of procedure. At this time, Judge Burdick alerted those present to the fact that his son-in-law was a member of the firm which was one of the firms representing the receiver, that the judge was indebted to Commonwealth on several fully-secured loans and that he had some fiduciary accounts with Commonwealth. Judge Burdick stated that none of the foregoing would affect his ability to hear and judge the case fairly and impartially. The hearing was adjourned to November 17.

Various motions were filed during the adjournment, including a motion to disqualify Judge Burdick. The latter was noticed for November 14 and it was assigned to Judge Nathan Kaufman. November 11, Judge Burdick requested the presiding judge to reassign the case and it was reassigned on blind draw to Judge Moody. This reassignment was contested below and is contested on appeal.

November 17, Judge Moody presided and outlined ground rules for the proceedings. At respondents'

request, the hearing was adjourned to November 28. Further delay ensued from an attempt to remove the proceeding to Federal court. This was denied by Federal district court December 7, and several of the respondents thereupon sought appeal to this Court. The application for leave to appeal was denied by this Court February 21, 1967, and by the Supreme Court the same date.

March 1, 1967, Judge Moody notified all parties of record that the hearing on the order to show cause would commence April 6, 1967, and continue until terminated. The hearing commenced as scheduled and final argument was concluded August 31. Judge Moody's opinion was filed September 29, 1967, which found independently that Public was insolvent October 11, 1966, that the appointment of a receiver was justified as was the sale of Public Bank to Commonwealth. Judge Moody found no error in the procedure followed. Judgment was entered and these appeals followed.

In making this detailed statement of facts, we are not unmindful of defendants' contention below and here that the only pertinent facts are those developed before Judge Burdick on the night of October 11 and 12. We agree with Judge Moody that proper adjudication of this controversy requires a full and complete record. For this reason, we have adopted the findings of Judge Moody which we consider pertinent to decision.

Appellants dispute the authority of the trial court to appoint a receiver for Public Bank on the basis that the trial court applied an improper definition of "insolvency".

The determination of this issue is controlled by § 115 of the Michigan Financial Institutions Act[2]

---

[2] MCLA § 487.115 (Stat Ann 1957 Rev § 23.868).

(MFIA), which enumerates several grounds which justify the appointment of a receiver by the court. The act provides in part:

"The following shall constitute grounds for the appointment of a receiver (as hereinafter provided) for any bank subject to the provisions of this act:

\*      \*      \*

"2. Whenever any bank shall become insolvent.

\*      \*      \*

"4. Whenever a bank has refused to pay its deposits or obligations in accordance with the terms under which such deposits or obligations were incurred".

The trial court, relying on subsection 2, appointed a receiver for Public Bank after making the following findings of fact and conclusions of law:

"Instead of just being limited to a time when a bank has refused to pay its deposits or obligations in accordance with the terms under which deposits were incurred, *grounds for appointment of receiver also are established whenever a bank has liability that exceeds the fair market value of its assets.*

\*      \*      \*

"Public Bank was insolvent on October 11, within the meaning of section 115 of the Michigan Financial Institutions Act (*i.e.,* it had) *liabilities that exceed(ed) the fair market value of its assets."* (Emphasis added.)

Appellants contend that the Commissioner's petition was faulty and inadequate in that the appointment of a receiver, based upon the petition, was neither authorized nor legal since said appointment

was based upon an erroneous definition of insolvency.   Appellants argue that the test of insolvency in Michigan is whether a bank is able to pay its obligations in the ordinary course of business, *not* whether the liabilities exceeded the fair market value of its assets.   Appellants cite the following cases in support of their position:   *Daugherty* v. *Park* (1936), 274 Mich 673; *Greene* v. *Ancient Order of Gleaners* (1934), 267 Mich 488; *Stone* v. *Jenison* (1897), 111 Mich 592; *Stone* v. *Dodge* (1893), 96 Mich 514.

It should be noted, however, that the cases cited by appellants were decided prior to the enactment of the Michigan Financial Institutions Act (MFIA) and were based upon former statutes.   As such, we do not consider these cases to be binding precedent for the issue presented in the instant case.[3]

A determination of a bank's insolvency based upon the relation of assets to liabilities is well recognized. See, *e.g., United States Savings Bank* v. *Morgenthau* (1936), 66 App DC 234 (85 F2d 811); *Kester* v. *Helmer* (1935), 16 F Supp 260; *McIlvaine* v. *City National Bank & Trust Company of Chicago* (1942), 314 Ill App 496 (42 NE2d 93); *In re Citizens Exchange Bank of Denmark* (1927), 140 SC 471 (139 SE 135).   See, generally, 9 CJS, Banks and Banking § 486, pp 943, 944.   In *Commercial National Bank in Shreveport* v. *Connolly* (CA 5, 1949), 176 F2d

[3] Appellants suggest that the decision in *Insurance Commissioner* v. *American Life Ins. Co.* (1939), 290 Mich 33, decided subsequent to the enactment of the MFIA, requires this Court to accept the definition of bank insolvency as set forth in the cases cited by the appellants.   We disagree.   The issue presented in *American Life Insurance* relates to the insolvency of an insurance company and a determination of that issue based upon the insurance code, not the MFIA.   The reference by the court to the definition of bank insolvency, as defined in *Greene* v. *Ancient Order of Gleaners* (1934), 267 Mich 488, is merely *obiter dictum.*

1004, 1007,[4] the court stated the following with respect to the issue of a bank's solvency:

"[T]he universal requisite for a bank to be solvent [is] *that it must own assets in an amount at least equal to its liabilities.*" (Emphasis added.)

Prior to the 1937 enactment of the MFIA, banking in Michigan was governed by the General Banking Act of 1929. See *Stewart* v. *Algonac Savings Bank* (1933), 263 Mich 272. Section 62 of the 1929 act[5] was the predecessor of § 115 of the MFIA. Under § 62 of the 1929 banking act the following qualified as a ground for the appointment of a receiver:

"[I]f the commissioner shall have become satisfied that any bank has refused to pay its deposits and/or obligations in accordance with the terms on which such deposits and/or obligations were incurred."

The 1929 act did not, however, expressly list "insolvency" as one of the grounds for the appointment of a receiver.

Ground 4 of § 115 of the MFIA is virtually identical to the quoted section of the 1929 banking act. Thus, the refusal "to pay its deposits or obligations" was retained as a criterion for the appointment of a receiver, but the bank's "insolvency" was expressly added as an additional ground for the appointment of a receiver. In view of existing case law and the previous statute, a question is presented as to whether the insertion of the "insolvency" ground by the legislature in § 115 of the MFIA was intended to be a redundancy. That is, did the legislature

---

[4] Rehearing denied (1949), 177 F2d 514.
[5] PA 1929, No 66, § 62 (CL 1929, § 11959).

intend that ground 2 (insolvency) was to be equated with ground 4 (refusal to pay deposits or obligations)?  We answer these questions in the negative. Legislative intent is seldom, if ever, effectuated by discarding certain phrases in statutes on the theory that they were inserted superfluously.  Rather, reason dictates that the "insolvency" ground under § 115 of the MFIA was intended by the legislature to mean something in *addition* to, and *distinct* and *different* from, "a refusal to pay deposits and obligations".

The Michigan Financial Institutions Act was enacted in 1937 following a recent background of bank failures.  The purpose of the act was to increase, not diminish, public protection.  The history of § 115 illustrates that ground 2 (insolvency) was *not* intended to have the same meaning as ground 4 (refusal to pay deposits or obligations).  To construe the statute otherwise would deny ground 2 any force or effect and make it meaningless.  Since a bank can meet obligations and yet be near collapse because its liabilities exceed the fair market value of its assets, the appointment of a receiver under such circumstances was deemed necessary by the legislature.  Ground 2 authorizes the appointment of a receiver by the court following a determination of the bank's insolvency.  It does not require that the court wait until the bank is without cash, its doors closed, its irretrievable position a subject of public knowledge, and the very catastrophe permitted to precipitate which the commission sought to avert by the proceedings below.

The finding of fact by the trial court that the liabilities of Public Bank exceeded its assets by $1,362,779.20 is supported by the record.  Thus,

ground 2 of § 115 of the MFIA empowered the trial court to appoint a receiver for the bank. We find no error in the trial court's determination of fact or application of law.

Appellants contend that the appointment of FDIC as receiver was improper under Michigan and Federal statutory authority.

Two separate sections under the MFIA relate to the appointment of a receiver for a bank.

MFIA § 115 provides in part:

"Upon being satisfied that all or any of the grounds for the appointment of a receiver set forth in this section exist and that the interests of the depositors and creditors of the bank and other parties in interest render such action expedient, the commission, with the attorney general representing it, shall apply to the circuit court of the county in which said bank is located for the appointment of a receiver of the bank. Upon presentation to it of such application and upon its being satisfied that all or any of the grounds for the appointment of a receiver set forth in this section exist and that the interest of the depositors and creditors of the bank and other parties in interest render such action expedient, *the said court shall immediately appoint a receiver for the bank who shall proceed to close the bank* and enforce the personal liability of shareholders as provided for in section 59 of this act, if any exists, and require of the receiver so appointed such bond as the court deems proper. The court may appoint as receiver 1 of the bank examiners of the commission or some other *competent and disinterested person who shall have the recommendation of the commission* * * * ." (Emphasis added.)

MFIA § 125 specifically provides for the appointment of FDIC as receiver under the following circumstances:

"The federal deposit insurance corporation created by section 8 of 'the banking act of 1933' is hereby empowered, *when authorized by the commission,* to act as receiver without bond for any banking institution, the deposits in which are to any extent insured by said corporation, *and which shall have been closed.*

"*The commission may, in the event of such closing, tender to said corporation* the appointment as receiver of such banking institution, and if the corporation accepts said appointment, the corporation, as receiver, shall have and possess all the powers and privileges provided by the laws of this state with respect to a receiver of a banking institution and be subject to all the duties of such receiver, except insofar as such powers, privileges, or duties are in conflict with the provisions of 'the banking act of 1933'." (Emphasis added.)

Appellants contend that FDIC can be appointed as a receiver *only* under the authority of MFIA § 125 and that MFIA § 115 does *not* authorize the appointment of FDIC as a receiver. Since no order of closing had been made or issued prior to the end of Public Bank's working day on October 11, 1966, appellants argue that the appointment of FDIC as a receiver was unauthorized. We disagree.

MFIA §§ 115 and 125 were enacted to cover separate and distinct situations. If a bank is *closed,* § 125 empowers the *commission,* without the necessity of court proceedings, to tender the appointment as receiver to FDIC if the deposits of the closed

bank are to any extent insured by FDIC.[6]  In contrast to § 125, § 115 applies to an involuntary proceeding in which the *circuit court,* upon application by the commission, appoints a receiver "who shall proceed to close the bank".  Thus, in a situation where the bank has not been closed, but one of the grounds enumerated under § 115 obtains, the court is empowered to appoint a receiver for the bank.

Although § 115 does not specifically state that FDIC must be appointed as the receiver, the court is authorized to "appoint as receiver 1 of the bank examiners of the commission *or some other competent and disinterested person* who shall have the recommendation of the commission".  Therefore, the issue as to whether the appointment of FDIC as receiver in the instant case was proper depends on whether FDIC qualified as a "competent and disinterested person".

FDIC is a governmental agency, created by Congress for the purpose of insuring bank deposits and protecting depositors and the public interest in connection therewith.  12 USCA § 1811 *et seq.*  Its management is vested in a board of three directors, one being the comptroller of the currency, and two appointed by the President of the United States, by and with the advice and consent of the Senate. 12 USCA § 1812.  In addition to other purposes, FDIC was created "to promote soundness in banking".  *Freeling* v. *Federal Deposit Insurance Corporation* (WD Okla, 1962), 221 F Supp 955, 956. The fact that the FDIC insured the deposits of

---

[6] Under federal law, 12 USCA § 1821(e), FDIC is compelled to accept the appointment as receiver if a bank has been closed on account of its inability to meet the demands of its depositors.

Public Bank would not preclude it from being appointed as a receiver for a state bank:

"Congress thus has authorized the FDIC to act simultaneously in the dual capacity of a federal insuror and as a state receiver.". *Freeling* v. *Sebring* (CA 10, 1961), 296 F2d 244, 245.

Although MFIA § 125 does not control the appointment of a receiver in the instant case because Public Bank had not been closed, the statute illustrates that the legislature did not consider FDIC's position as an insurer to be in conflict with the duties imposed upon a receiver. Additionally, it should be noted that under the banking act of 1969, the legislature has once again expressed its opinion that FDIC possesses the very kind of interest which qualifies it to become a receiver of a state bank. The act provides in part:

"In any proceeding for the appointment of a receiver the commission *shall request that the court appoint the federal deposit insurance corporation as the receiver* if the deposits in the bank are insured to any extent by the corporation."[7] (Emphasis added.)

We conclude that FDIC does not have the type of interest which would disqualify it from being appointed by the court as a receiver under § 115. Rather, its expertise and qualifications, as well as its mandate to act for the protection of depositors, creditors and other interested parties is, in the contemplation of the legislature, the type of interest making it a preferred receiver.

---

[7] MCLA 1970 Cum Supp § 487.551 (Stat Ann 1970 Cum Supp § 23.710[251]).

Appellants assert that the appointment of FDIC as a receiver was error under Federal law in that no portion of the Federal Deposit Insurance Act[8] invests FDIC with any general power to act as a receiver. Appellants contend that Congress has specifically empowered FDIC to accept the appointment as receiver of a state bank only in the following situation:

"(e) Whenever any insured State bank (except a District bank) *shall have been closed* by action of its board of directors or by the authority having supervision of such bank, as the case may be, on account of *inability to meet the demands* of its depositors, the Corporation shall accept appointment as receiver thereof, if such appointment is tendered by the authority having supervision of such bank and is authorized or permitted by State law." 12 USCA § 1821(e). (Emphasis added.)

Since Public Bank met the demands of its depositors on October 11, 1966, appellants say that Federal law precluded FDIC from accepting the appointment as receiver.

The defect in appellants' argument rests in its basic premise that "no portion of the Federal Deposit Insurance Act invests FDIC with any general powers to act as receiver". The Federal Deposit Insurance Act sets forth the general powers of the FDIC and provides as follows:

"Upon June 16, 1933, the Corporation [FDIC] shall become a body corporate and as such shall have power—

" * * * Ninth. *To act as receiver*". 12 USCA § 1819(9). (Emphasis added.)

---

[8] 12 USCA § 1811 *et seq.*

The foregoing is an explicit, unequivocal and unqualified grant of authority to FDIC to act as receiver. No other conclusion can be drawn from the statute. This section of the statute empowers FDIC with the authority to act as receiver even though the bank has not been "closed * * * on account of inability to meet the demands of its depositors".

No conflict exists between 12 USCA § 1819(9) and 12 USCA § 1821(e). The former section entrusts the FDIC with the general *power* to act as a receiver. The latter section imposes the *duty* upon FDIC to accept the appointment as a receiver if tendered by the proper authority when the insured state-chartered bank is *closed* on account of inability to meet depositor demands. A reasonable interpretation of the statute would require the conclusion that FDIC *must* accept the appointment as receiver in situations covered by § 1821 and that it *may,* under the authority of § 1819, act as a receiver of a state bank in other situations.

Having decided that Public Bank was insolvent and that the FDIC could legally act as its receiver, we turn now to the question of whether the *ex parte* appointment of the FDIC violates the due process clauses of the Michigan and Federal Constitutions.

Preliminarily, we note that the Michigan Financial Institutions Act[9] (MFIA) expressly dispenses with any notice requirement:

"Upon being satisfied that all or any of the grounds for the appointment of a receiver set forth in this section exist and that the interests of the depositors and creditors of the bank and other parties in interest render such action expedient, the commission, with the attorney general representing it, shall apply to the circuit court of the county in

9 MCLA § 487.1 *et seq.* (Stat Ann 1957 Rev § 23.711 *et seq.*).

which said bank is located for the appointment of a receiver of the bank. Upon presentation to it of such application and upon its being satisfied that all or any of the grounds for the appointment of a receiver set forth in this section exist and that the interest of the depositors and creditors of the bank and other parties in interest render such action expedient, *the said court shall immediately appoint a receiver for the bank.*" MCLA § 487.115 (Stat Ann 1957 Rev § 23.868) (Emphasis added.)

Pursuant to this section, Commissioner Slay applied to the circuit court to have the FDIC appointed as a receiver. Such appointment was made by Judge Burdick without notice to the bank or its stockholders, but providing for a later hearing at which time all parties would be afforded an opportunity to make objection. It is this failure to give notice which is claimed to be unconstitutional.

Appellants contend that due process requires notice and a hearing, citing a multiplicity of cases for this proposition. It cannot be disputed that in the ordinary case notice and an opportunity to be heard are constitutional prerequisites in any proceeding which is to be accorded finality. *Milford v. People's Community Hospital Authority* (1968), 380 Mich 49. But it is equally indisputable that the regulation of banks and other such institutions burdened with a public trust have never been treated as an "ordinary case"—and rightfully so. The banking business, more than any other, has been the subject of the most careful scrutiny of regulatory agencies. The unique character and tradition of banking often justify the delegation of extremely broad discretionary powers to state banking commissioners which, if attempted elsewhere, would likely violate due process. 1 Davis, Administrative

Law Treatise, § 4.04, p 247.  It is with this background in mind that we undertake to decide the constitutional issues here raised.

In the case of *Fahey* v. *Mallonee* (1947), 332 US 245 (67 S Ct 1552, 91 L Ed 2030), the Supreme Court faced an analogous issue.  The Federal Home Loan Bank Board was authorized to appoint a conservator for any Federal Savings and Loan Association without a prior hearing "if it is in an unsafe or unsound condition".[10]  When a conservator was appointed for the Long Beach Federal Savings and Loan Association, the constitutionality of the statute was challenged in a stockholder's derivative action.  The Court's discussion lights the path which we choose to follow:

"The provisions are regulatory.  They do not deal with unprecedented economic problems of varied industries.  They deal with a single type of enterprise and with the problems of insecurity and mismanagement which are as old as banking enterprise.  The remedies which are authorized are not new ones unknown to existing law to be invented by the Board in exercise of a lawless range of power.  Banking is one of the longest regulated and most closely supervised of public callings.  It is one in which accumulated experience of supervisors, acting for many states under various statutes, has established well-defined practices for the appointment of conservators, receivers and liquidators.

\* \* \*

"A discretion to make regulations to guide supervisory action in such matters may be constitutionally permissible while it might not be allowable to authorize creation of new crimes in uncharted fields.

"The Board adopted rules and regulations governing appointment of conservators.  They provided

10 24 CFR 1943 Supp § 206.1(2).

the grounds upon which a conservator might be named, and they are the usual and conventional grounds found in most state and federal banking statutes. They are sufficiently explicit, against the background of custom, to be adequate for proper administration and for judicial review if there should be a proper occasion for it.

"It is complained that these regulations provide for hearing after the conservator takes possession instead of before. This is a drastic procedure. But the delicate nature of the institution and the impossibility of preserving credit during an investigation has made it an almost invariable custom to apply supervisory authority in this summary manner. It is a heavy responsibility to be exercised with disinterestedness and restraint, but in the light of the history and customs of banking we cannot say it is unconstitutional". *Fahey* v. *Mallonee, supra,* 250–254.

We can see no justification for a different rule in the case of a state bank than was applied in the *Fahey* case to a Federal Savings and Loan Association. Each case deals with an institution charged with a public interest; each provides for a later hearing at which objections may be made. We are convinced that the same considerations which prompted the regulation in the *Fahey* case are also present in this case and require the same result. We hold that the MFIA in furtherance of the regulation of banks and banking may constitutionally provide for the *ex parte* appointment of a receiver upon the application of the commissioner of banking. For other cases allowing *ex parte* appointment see: *Granader* v. *Public Bank* (CA 6, 1969), 417 F2d 75; *Greater Delaware Valley Federal Savings and Loan Association* v. *Federal Home Loan Bank Board* (CA 3, 1958), 262 F2d 371; *Title Guaranty & Surety*

*Company* v. *Idaho* (1916), 240 US 136 (36 S Ct 345, 60 L Ed 566); *Tuller* v. *Wayne Circuit Judge* (1928), 243 Mich 239.

Appellants next contend that even if the appointment is valid, the *ex parte* sale of assets to Commonwealth is violative of due process. Again appellants rely on the due process argument and we reiterate that exigent circumstances such as the impending, catastrophic failure of a large state bank may modify the usual requirements of due process.

With respect to the sale of the assets of a state bank, the MFIA provides in part:

"The receiver, under the direction of the commission, shall take possession of the books, records, and assets of every description of such bank, collect all debts, dues, and claims belonging to it, and, upon the order of a court of competent jurisdiction may sell or compound any or all bad or doubtful debts, and, on a like order, *may sell any or all the real and personal property of such bank, on such terms as the court shall direct;* \* \* \* ". MCLA § 487.116 (Stat Ann 1957 Rev § 23.869) (Emphasis added.)

This language clearly encompasses an order to sell *ex parte*. *Dugger* v. *Cox* (1938), 110 F2d 834. Within hours after its appointment, the FDIC submitted to the circuit court for its approval "Agreement B" which provided for the sale of Public's assets to Commonwealth. This agreement had been approved by the directors of both banks, but had not been submitted to the stockholders due to a problem with the proxy statement. Appellants now claim that the court's approval of Agreement B without notifying them violated due process. This claim is without merit.

In *Minichello* v. *Saxon* (MD Pa, 1967), 266 F Supp 279, a sale of the assets of a national bank with only director approval was upheld. The National Banking Act provides that the comptroller of currency may waive shareholder approval of the sale of the assets of a national bank where he determines that an "emergency" exists and may proceed with only the approval of the directors.[11] The court there determined that an emergency exists when imminent danger of insolvency requires prompt action to safeguard the value of the assets. That case permits action similar to that now claimed to be unconstitutional even without a finding of insolvency. The justification is the protection of the public:

"It would appear further that section 181 which requires the purchasing bank to assume the deposit liabilities of the selling bank was designed to permit a troubled bank, heading towards a possible insolvency and being in the midst of an emergency, to move swiftly through its directors, to sell its assets to another bank which would give the selling bank's depositors one hundred per cent protection on all deposits, regardless of size". *Minichello* v. *Saxon,* *supra,* 286.

The parallel between the *Minichello* case and this one is obvious. On October 11, 1966, the Public Bank was found to be insolvent. This situation constituted a grave emergency since, *inter alia,* there were over ten million dollars in uninsured deposits. Swift action was required to protect the creditors and depositors of Public. Commonwealth's offer to assume all liabilities afforded this protection, but the offer to purchase was conditioned upon Public's

---

[11] 12 USCA § 181.

continued normal operation. The probable result of notice of the receivership proceedings would be a "run" on the bank thus dashing any hope of consummating a sale to Commonwealth. It is not contended that the terms of the sale were unfair to Public, nor is it contended that anyone had made a better offer. Further, the circuit court provided for a subsequent hearing at which objections to the sale could be made; this hearing extended over approximately 42 hearing days giving all parties ample opportunity to present their positions. In light of the history and tradition of bank regulation, reason and logic as well as judicial precedent dictate that due process does not require notice when such is likely to precipitate a run on a major bank. Indeed, the giving of notice in such cases would defeat the very purpose of notice, *i.e.,* to safeguard the interests of all parties. We hold that the proceedings of October 11 and 12 were not constitutionally infirm for the reasons urged by appellants. On the contrary, they were the only feasible means of handling a potentially disastrous bank failure.

Finally, defendants assert several procedural errors allegedly in violation of designated state and local court rules as basis for appellate relief. We have affirmed the finding of the trial court that Public Bank was insolvent October 11, 1966, and we have found no constitutional infirmity in the sale of Public's assets to Commonwealth. These determinations necessarily influence our review of the procedural errors presented by these appeals. In addition, we find the following peculiarly applicable to these appeals:

"Rules of practice and procedure are exactly that. They should create no rights and should be thought

of as indicating the way in which justice should be administered. They should give direction to the process of administering justice but their application should not become a fetish to the extent that justice in an individual case is not done. There is a need for guides and standards. They must be followed but they must always be thought of as guides and standards to the means of achieving justice, not the end of justice itself". 1 Honigman & Hawkins, Michigan Court Rules Annotated (2d ed), p 15, Committee Notes.

"While this Court should and does give due regard to its own rules, the promulgation thereof cannot shackle the powers of this Court to do that which ought to be done if otherwise within the powers of the Court." *St. John* v. *Nichols* (1951), 331 Mich 148, 159. Adopted by the Court of Appeals in *Guastello* v. *Citizens Mutual Insurance Company* (1968), 11 Mich App 120, 137.

Except for the effect on these proceedings of the disqualification of Judge Burdick under GCR 1963, 405, we perceive no purpose to be served by a detailed discussion of the several procedural errors complained of. Assuming the errors, our prior determinations in this opinion and the facts of this case preclude a holding that any or all of such errors constitute a basis for reversal.

Judge Burdick was not disqualified when he found Public Bank insolvent nor when he appointed a receiver for the insolvent bank. His technical disqualification arose when he appointed a law firm, of which his son-in-law was a member, as one of two legal representatives for the receiver. There is no claim that the son-in-law had anything to do with this litigation. Thereafter, Judge Burdick approved the sale of Public's assets to Commonwealth according to an agreement already approved

by Public's board of directors. To hold that the taint of disqualification was sufficient to overturn what amounted to no more than judicial approval of Public's prior agreement would be absurd. We find no error or defect in these proceedings which affects the substantial rights of defendants. GCR 1963, 13.

Affirmed.