FEDERAL DEPOSIT INSURANCE
CORPORATION, Plaintiff,

v.

AMERICAN BANK TRUST SHARES,
INC. (ABTS), Carl Joe Taylor, Individu-
ally and as a shareholder of American
Bank Trust Shares, Inc. (ABTS), suing
in behalf of himself and all other share-
holders of said corporation, and for the
benefit of said corporation's subsidiary
company, American Bank & Trust
(AB&T), Howard H. Lamar, H. Ciremba
Amick, William F. Lambert, Harry L.
Parker, Banks H. Good, Augustus T. Al-
len, Douglas R. Bryant, Sr., Robert B.
Fickling, James H. Gressette, Dick G.
McTeer, Jack G. Vallentine, Marshall B.
Williams, J. W. Wall, Jr., Albert E.
Odom, William H. Grier, Luther H. Ad-
den, Jr., Sidney Robinson Bagby, Dr. J.
O. Ryan, A. G. Dwyer, Estate of Dr. C. P.
Ryan, Sr., by its Executor Dr. C. P.
Ryan, Jr., J. E. Smith, C. J. Getsinger,
Weldon E. Wall, Catherine H. Hightow-
er, R. P. Preacher, H. Kleigh Purdy, Jr.,
Dr. T. B. Carroll, Jr., Harold Wall, A. G.
Martin, J. Glenn Jarrell, J. W. Wall, Sr.,
F. A. Nimmer, Jr., suing derivatively on
behalf of American Bank Trust Shares,
Inc. (ABTS), and on behalf of them-
selves and all other stockholders simi-
larly situated, Sadie G. Schein, Individu-
ally and suing on behalf of all other
Capital Noteholders of American Bank
& Trust (AB&T), Defendants.

Civ. A. No. 74-1782.

United States District Court,
D. South Carolina,
Orangeburg Division.

Oct. 26, 1978.

Charles H. Gibbs, Charleston, S. C., Myers N. Fisher, J. Craig Gilliland, Washington, D. C., for plaintiff.

Joseph R. Young, Charleston, S. C., for American Bank Trust Shares.

Henry Hammer, Columbia, S. C., Lawrence Gressette, St. Matthews, S. C., for Marshall B. Williams, Douglas R. Bryant, Sr., James H. Gressette, Jack G. Vallentine, Luther H. Adden, Jr., Augustus T. Allen.

Douglas McKay and F. Earl Ellis, Jr., Columbia, S. C., for H. Ciremba Amick.

Charles W. Wofford, Greenville, S. C., for Howard Lamar, Harry Parker and Albert Odom.

Jeter E. Rhodes, Jr., Thomas McCutchen, Columbia, S. C., Terry E. Richardson, Jr., Barnwell, S. C., for Robert B. Fickling.

J. Buford Grier, Rock Hill, S. C., for William H. Grier, Banks H. Good, Dick G. McTeer and J. W. Wall, Jr.

Heyward E. McDonald, Columbia, S. C., for William F. Lambert.

W. Eugene Rutledge, Birmingham, Ala., James D. Pruett, Gadsden, Ala., Wm. McG. Morrison, Jr., Charleston, S. C., W. Stancil Starnes, Starnes, Starnes & Reddoch, Birmingham, Ala., for Sidney Robinson Bagby, et al.

J. Randolph Pelzer, No. Charleston, S. C., for F.D.I.C.

Francis T. Draine, Columbia, S. C., for defendant Carl Joe Taylor & Class in State Court Action and Sadie G. Schein.

## ORDER

SIMONS, District Judge.

Pursuant to due notice, this matter was heard before this court commencing on October 2, 1978, in the United States District Courthouse in Aiken, South Carolina.

The matter of the AB&T receivership has been before me over a period of years at this point. In the court's Order of April 23, 1976, this court determined that the Federal Deposit Insurance Corporation [FDIC] was the owner of all derivative causes of action against the officers, directors, and employees of American Bank & Trust [AB&T] and American Bank Trust Shares, Inc. [ABTS], for any harm done to AB&T. The shareholders of ABTS could only bring suit on such causes of action in a derivative capacity, which they have done. FDIC brought this suit asking for a declaratory judgment that it was the owner of these causes of action, and asked the court to stay the shareholders' derivative suits of various natures.

The court stayed the Bagby defendants' cause of action, which had been brought derivatively on behalf of the class of all ABTS shareholders [hereinafter referred to as "Shareholders"]. The court also stayed the Schein suit brought in state court by subordinated capital noteholders. In order that all litigation involving AB&T and ABTS would proceed in an orderly manner, the court stayed the foregoing causes of action pending further order of this court, and directed FDIC to proceed immediately with its causes of action against such officers, directors and employees.

The Shareholders appealed from the April 1976 Order. On appeal the Fourth Circuit agreed that FDIC had apparent title to these causes of action. It further ruled that this court must first decide certain issues which the court had invited the Shareholders to litigate in the state court, but which they had failed to do.

Pursuant to remand by the Fourth Circuit, all parties were permitted to conduct such discovery as they desired, and the case was certified as a class action, so that all shareholders who did not opt out would be parties and would be bound by any final judgment in this case.

After a hearing to determine whether or not this should be a non-jury or a jury trial, the court determined that the case must

proceed non-jury. At the request of the Shareholders the court certified this issue for an early appeal to the Fourth Circuit. That Court denied the petition for an early appeal, and this court proceeded to hear the case non-jury.

The court has now heard all the evidence presented by the Shareholders under their counterclaim wherein they had the burden of proof. It also heard the evidence presented by FDIC. The court has also received and studied the briefs filed by counsel for the parties.

During the trial the court endeavored to proceed as directed by the Fourth Circuit Court of Appeals in its opinion of July 8, 1977, which vacated the prior Order of this court of April 1976.

Although the Fourth Circuit agreed with this court's conclusion that FDIC had established apparent title to the derivative causes of action asserted by the Bagby shareholders, it concluded that before FDIC should be permitted to pursue such causes of action, this court must hear and determine the issues raised in the Shareholders' counterclaim pertaining to the manner and method whereby FDIC acquired the title to such causes of action.

The chief factual and legal issues raised by the Shareholders' counterclaim, which the Fourth Circuit has instructed this court to hear and determine, are as follows:

1. That FDIC was improperly appointed receiver of the bank.

2. That South Carolina statutes allowing such an appointment were unconstitutional.

3. That FDIC was a principal wrongdoer in the bank's collapse.

4. That FDIC procured its appointment as receiver by fraud practiced upon the State Board of Bank Control.

5. That South Carolina statutes allowing the acquisition of the bank's assets by FDIC were unconstitutional.

6. That FDIC procured approval of the sale by fraud practiced upon the State Court.

Based upon the Shareholders' trial brief, the court was of the opinion the Shareholders' main contention to be litigated in this trial was the issue of the constitutionality of three South Carolina statutes; that is Sections 8–273, 8–274, and 8–276 of the 1962 Code of Laws, which are now contained in the 1976 Code as Sections 34–3–630, 34–3–640, and 34–3–660.

However, at the commencement of the trial the court was advised by the Shareholders' counsel that they were not abandoning their contentions of fraud and illegal action on the part of FDIC. So the court heard evidence presented on all of the issues.

In their counterclaim, the Shareholders ask that the appointment of FDIC as a receiver of AB&T be revoked; that the sale of the assets to Southern Bank and Trust Company and to FDIC be rescinded; and that the South Carolina State Board of Bank Control be enjoined from appointing any receiver for AB&T.

The factual background of the demise and subsequent closing of AB&T by the State Board of Bank Control and the appointment of FDIC as receiver is not in dispute.

AB&T, over a period of time before the September 20, 1974, closing date, had expanded and merged with several other banking institutions all over the state. AB&T committed itself to numerous personal property and real estate loans, and for several months prior to its closing, its liquidity became increasingly impaired.

When the bankruptcy of the Belser Company and its affiliated corporations occurred in the late summer of 1974, it became apparent that AB&T could not survive without substantial outside assistance from its participating banks, the Federal Reserve Bank and/or FDIC.

The record further substantiates that the FDIC did everything reasonably within its power to assist AB&T to survive, including the making of a hurried financial report at the request of Mr. Lamar, its President, in early September, 1974, to assist AB&T in

attempting to get financial help from the Federal Reserve Bank. FDIC also loaned AB&T nine million dollars on promissory notes to assist it with its dire short-term liquidity problem.

When the State Board of Bank Control, Mr. Cleveland, the South Carolina Commissioner of Banking, and the FDIC officials familiar with the situation realized that AB&T was hopelessly involved, and could not be revitalized under the plan presented by it pursuant to the efforts of AB&T Vice President Bagwell, the State Board of Bank Control, acting under the South Carolina Banking laws, as of 6:00 p. m. on September 20, 1974, closed AB&T and all of its branches, and tendered appointment as receiver of the bank to FDIC. FDIC accepted the appointment and immediately took over all of the assets of AB&T. This action was taken pursuant to the South Carolina statutes, *supra,* which are a part of the South Carolina Banking laws.

Anticipating that the bank could not survive for long, the FDIC, prior to the 20th of September, had prepared and submitted to at least four of the larger banks in South Carolina, a bid package seeking to sell certain assets of AB&T on the basis of the purchase and assumption agreement which the FDIC had prepared.

Southern Bank and Trust of Greenville, the highest bidder, agreed to pay a premium of some five and a half million dollars for the purchase of certain assets and the assumption of certain liabilities.

Immediately after the closing of AB&T by the State Board of Bank Control and its appointment as receiver, with the approval of the South Carolina Board and Commissioner of Banking, FDIC's attorneys appeared before the Honorable Clarence Singletary, Judge of the Ninth Judicial Circuit in Charleston, a court of competent jurisdiction, on the evening of September 20, 1974, and obtained an *ex parte* Order from that court approving the sale of part of the assets of AB&T to Southern Bank and Trust Company as provided for in a written agreement, and the sale of the remainder of the assets to FDIC, the corporation.

Although the record substantiates that the officials of AB&T had general knowledge of what was taking place, none of them were invited to attend the meeting of the State Board of Bank Control, at which time it was determined that AB&T would be closed and that FDIC would be tendered the position of receiver. Nor were such officials invited or officially notified of the *ex parte* hearing before Judge Singletary.

Sections 34–3–630, 34–3–640, and 34–3–660, S.C.Code (1976), provide for the closing of state banks and set out administrative procedures delegated by the Legislature of this State to the State Board of Bank Control. These statutes do not provide for any notice; the statutes also do not require notice of the hearing before a court of competent jurisdiction where an order is sought by a receiver to approve the sale of a bank's assets in the receiver's hands.

The Fourth Circuit Court of Appeals, in its opinion, summarized quite well what transpired at the closing of AB&T, stating as follows:

> To meet the demands of the Bank's depositors, and to prevent the disruption of vital business, FDIC, as receiver took the following steps: FDIC sold certain assets of Bank to Southern Bank & Trust Co. (Southern) upon Southern's agreement to assume Bank's deposit liabilities and to reopen Bank's offices under Southern's name.

*Federal Deposit Insurance Corporation v. American Bank Trust Shares, Inc.,* 558 F.2d 711, 713 (4th Cir. 1977).

AB&T had some 26 different branch offices located throughout the state. After their closing on Friday evening, September 20, 1974, they were all reopened for business the following Monday morning under the name of the Southern Bank and Trust Company.

The Fourth Circuit's opinion continues: FDIC sold the balance of Bank's assets to itself, in its general corporate capacity. These assets included "all contracts, rights, claims, demands, choses in action . . . whether known or unknown

. . . including any claims against its directors, officers, or employees arising out of . . . the nonperformance or manner of performance of their duties. . . ." In return, FDIC, as a corporation, agreed to furnish cash needed to consummate the original transaction with Southern. FDIC also agreed that if its recovery on the assets exceeded (a) the consideration paid for them; (b) the costs of collection; and (c) a profit of 6½%, it would pay the excess to itself, as receiver, for the benefit of Bank's estate and those parties having claims against it. In accordance with South Carolina law, these sales were presented to and approved by a state court before consummation.

558 F.2d at 713.

■ The bank officials, its board and/or the parent company ABTS, or its Shareholders, had the right under the decisions of the South Carolina Supreme Court to appeal to the State Circuit Courts from the administrative action of the State Board of Bank Control in closing AB&T and appointing FDIC as receiver. See Dunlap & Dunlap v. Zimmerman, 188 S.C. 322, 199 S.E. 296 (1938); Zimmerman v. Central Union Bank, 194 S.C. 518, 8 S.E.2d 359 (1940). They also had the right to appeal to the Supreme Court of South Carolina from the ex parte Order of Judge Singletary approving the sale of the assets of AB&T to Southern Bank and Trust Company, and the balance of the assets to the FDIC, in its corporate capacity. No such direct appeal was taken.

The right to such appeals is well supported by the decisions of the South Carolina Supreme Court, in cases where there are allegations of unreasonable administrative agency action, or where such action has been arbitrary, capricious, an abuse of discretion or unconstitutional. See, e. g., Cole v. Manning, 240 S.C. 260, 125 S.E.2d 621, 625 (1962), appeal dismissed, 372 U.S. 521, 83 S.Ct. 888, 9 L.Ed.2d 966 (1963). Although·such appeals do not appear to be specifically provided for by statute, the Supreme Court on several occasions has stated that the state courts, in the exercise of their equitable jurisdiction, do in fact have such power of review.

The main thrust of the Shareholders' contentions in their counterclaim is two-fold: First, that the demise of AB&T as a viable banking corporation, its closing by the State Board of Bank Control, the appointment of FDIC as receiver, and the purchase and assumption agreement with Southern Bank & Trust Co. [Southern] whereby part of the assets were sold to Southern, and the sale to itself of the remaining AB&T assets, including all causes of action against the officers, directors, and employees of AB&T and ABTS, are predicated and based upon fraud, negligence, and illegality on the part of FDIC, and/or the State Board of Bank Control, and the State Commissioner of Banking. They urge that this court should undo such actions. Secondly, the Shareholders contend that the South Carolina statutes under which such administrative actions were taken are unconstitutional, primarily on the basis that they do not provide for minimal due process under the United States and/or South Carolina Constitutions, and were contrary to law in any event.

As to the Shareholders' contention of fraud and wrongdoing on the part of FDIC and/or the State Board of Bank Control and the State Commissioner of Banking, the court concludes from the evidence before it that there is no evidence upon which it could reasonably find and determine such fraud, bad faith, negligence, or other wrongdoing, so as to warrant it in upsetting the actions of the State Board of Bank Control and the Order of Judge Singletary in approving the sale and the purchase and assumption agreement, even if this court had the jurisdiction and the authority to do so, which is not conceded.

The Shareholders in this derivative action stand in the stead and place of the holding corporation, ABTS, and they can only succeed if ABTS itself could have succeeded in proving such contentions by a preponderance of the evidence.

There is no semblance of evidence which would establish to any extent the nine ele-

ments of fraud and deceit as required under South Carolina law, nor the elements necessary to establish a claim of negligence or other illegality.

The Shareholders' main contentions of fraud are (1) that the FDIC, in bad faith during its periodic examinations of AB&T, misclassified millions of dollars of real estate loans held by AB&T, thereby bringing about its failure; and (2) that Mr. Wille, the Chairman of the Board of Directors of FDIC, fraudulently and in bad faith, issued a press release in early September, 1974, indicating that the FDIC had agreed to supply to AB&T any amount of funds necessary to keep it in operating condition, which action on his part fraudulently misled AB&T to its detriment and resulted in its failure.

■ There is in this record not a scintilla of evidence to indicate that the FDIC fraudulently and in bad faith classified any such loans as alleged by the Shareholders. Neither does the court agree with the Shareholders' contention that the press release of FDIC was made in bad faith and fraudulently, so as to result in the fraudulent and illegal closing of AB&T.

■ Under South Carolina law, fraud is never presumed and must be proved by clear and convincing proof. There is absolutely no such proof in this case.

From the evidence presented, the court is firmly convinced that the FDIC acted totally in good faith and did everything it reasonably could to assist AB&T to survive as a going bank, and that FDIC used reasonable care in carrying out its statutory functions in its examinations of AB&T.

The court is aware that FDIC is a public agency, using public funds. It advanced $9,000,000.00 in September, 1974, to assist AB&T with its liquidity problem. It also cooperated fully in every way requested by the officials of AB&T. This court refuses to fault FDIC under the circumstances for not putting millions of dollars more into AB&T, especially in view of its dire financial condition in September of 1974.

■ As to the Shareholders' contention that FDIC was negligent in failing to disclose to the public adverse financial information which it discovered during the course of examinations of AB&T, the court concludes, based upon sound precedent, that there was no duty on the part of FDIC to disclose any such adverse information. See *Social Security Administration Baltimore Federal Credit Union v. United States,* 138 F.Supp. 639, 646 (D.Md.1956).

The court will now consider the Shareholders' contentions as to the unconstitutionality of the State banking statutes and the illegality of the closing of the bank, the appointment of FDIC as receiver, and the sale of assets.

In approaching this question, the court is mindful of the fact that AB&T, a state chartered bank, was organized under and owed its existence to the South Carolina banking laws, as codified in the present Code, Title 34, and its predecessor sections. It operated under, enjoyed, and received the benefits and protections of these laws over a period of years.

The court determines, on three bases, that the Shareholders have utterly failed to establish their contentions attacking the constitutionality of these statutes and the legality of the actions taken.

First, the court concludes that the Shareholders are estopped to contest the constitutionality of these statutes under the circumstances presented by the facts in this case.

Secondly, the court concludes that the Shareholders cannot collaterally attack in this action the administrative agency action of the State Board of Bank Control in closing AB&T, and in appointing FDIC as a receiver, nor the action and order of Judge Singletary, Judge of the Ninth Judicial Circuit, in approving the purchase and the assumption agreement and the sale of some of the assets to Southern Bank and Trust Company and the sale of the remainder of AB&T's assets to FDIC, the corporation.

Thirdly, the court is convinced under applicable United States Supreme Court, other Federal Court, and South Carolina Su-

preme Court decisions, that these statutes are constitutional and do not deny minimal due process.

As to the first matter, that is, whether the Shareholders are estopped, or have waived the right to contest the constitutionality of these state statutes in this proceeding, the United States Supreme Court held in *Fahey v. Mallonee,* 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947), in a derivative suit on behalf of a federal savings and loan association organized under the provisions of the Home Owners Loan Act of 1933, that the shareholders of a savings and loan association were estopped from challenging the constitutionality of certain provisions of that Act which authorized the Federal Home Loan Bank Board to prescribe the terms and conditions upon which a conservator may be appointed.

*Fahey v. Mallonee,* reads in part, as follows:

This is a stockholders' derivative action in which plaintiffs sue only in the right of the Association. It is an elementary rule of constitutional law that one may not "retain the benefits of the Act [the Federal statute] while attacking the constitutionality of one of its important conditions." *United States v. San Francisco,* 310 U.S. 16, 29, 60 S.Ct. 749, 84 L.Ed. 1050, 1059. As formulated by Mr. Justice Brandeis, concurring in *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 348, 56 S.Ct. 466, 80 L.Ed. 688, 711. "The Court will not pass upon the constitutionality of a statute at the instance of one who has availed himself of its benefits."

In the name and right of the Association it is now being asked that the Act under which it has its existence be struck down in important particulars, hardly severable from those provisions which grant its right to exist. Plaintiffs challenge the constitutional validity of the only provision under which proceedings may be taken to liquidate or conserve the Association for the protection of its members and the public. If it can hold the charter that it obtained under this Act and strike down the provision for termi-

nating its powers or conserving its assets, it may perpetually go on, notwithstanding any abuses which its management may perpetrate. It would be intolerable that the Congress should endow an Association with the right to conduct a public banking business on certain limitations and that the Court at the behest of those who took advantage from the privilege should remove the limitations intended for public protection. It would be difficult to imagine a more appropriate situation in which to apply the doctrine that one who utilizes an Act to gain advantages of corporate existence is estopped from questioning the validity of its vital conditions. We hold that plaintiffs are estopped, as the Association would be, from challenging the provisions of the Act which authorize the Board to prescribe the terms and conditions under which a conservator may be named.

332 U.S. at 255–56, 67 S.Ct. at 1557.

From our research it appears that this decision has not been overruled or modified in any particular. It has been cited by numerous courts following the principles enunciated therein.

There is no dispute here that AB&T was organized under and owed its very existence to the state banking laws, parts of which the Shareholders now contend are unconstitutional. The Shareholders assert that these South Carolina statutes are constitutionally infirm because they do not provide nor afford minimal due process guaranteed by the Fourteenth Amendment. Shareholders rely primarily on *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). Their reliance is misplaced. Footnote 23 of that opinion says, in part, as follows: "In three cases, the Court has allowed the attachment of property without a prior hearing. In one, the attachment was necessary to protect the public against the same sort of immediate harm involved in the seizure cases—a bank failure." Furthermore, in the body of the opinion, the Court states: "Thus, the Court has allowed summary seizure of property to collect the internal revenue of the United

States, to meet the needs of a national war effort, [and] to protect against the economic disaster of a bank failure [referring by footnote to *Fahey v. Mallonee*] . . . ." 407 U.S. at 91–92, 92 S.Ct. at 2000.

■ Based upon these decisions, this court is firmly convinced and has concluded that the Shareholders, who are standing in the position of ABTS, are estopped from and have waived their right to contest the constitutionality of these statutes.

■ Secondly, the court has concluded, in reference to the assertion of illegality in the appointment of FDIC as receiver, and in the closing of the bank and the sale of its assets, that these Shareholders in the derivative suit do not have a right to attack collaterally the administrative decision of the State Board of Bank Control taken pursuant to State statute, nor do they have the right to attack collaterally the judicial action of the State Court in approving the sale of the bank's assets. Neither does this court have the jurisdiction to hear and determine the issues raised in this collateral attack.

As noted earlier, the South Carolina Supreme Court has held in *Zimmerman v. Central Union Bank,* 194 S.C. 518, 8 S.E.2d 359 (1940), and *Dunlap & Dunlap v. Zimmerman,* 188 S.C. 322, 199 S.E. 296 (1938), that the actions of the State Board of Bank Control are subject to judicial review in proper cases.

Thus, it clearly appears that AB&T and ABTS had the right to appeal from the decisions of the State Board and the State Court, which effectuated the closing of AB&T, the appointment of FDIC as the receiver, and the sale of the bank's assets.

Neither AB&T, its parent company ABTS, nor the shareholders of ABTS exercised their right of appeal. Therefore, this court concludes that the decision of the State Board of Bank Control to close AB&T and appoint FDIC as receiver, and the decision of the Banking Commissioner and the State Court to approve the sale of assets to FDIC, are not subject to collateral attack in this proceeding.

This court, in a number of cases in which FDIC and Southern Bank and Trust Company have been involved, has held recently that the AB&T purchase and assumption transaction is not subject to collateral attack. Among these cases are *Associates Capital Co., Inc. v. FDIC and Southern Bank & Trust Co.,* Civil Action 76–0245 (District of South Carolina, April 28, 1977); *Federal Deposit Insurance Corporation v. Moore Ventures, et al.,* Civil Action 76–1217 (District of South Carolina, February 18, 1977); *Federal Deposit Insurance Corporation v. Moore, et al.,* Civil Action 76–0997 (District of South Carolina, February 28, 1978); *Federal Deposit Insurance Corporation v. Moore,* 448 F.Supp. 493 (D.S.C.1978).

These recent decisions by this court with respect to closing AB&T follow a long line of precedent in South Carolina and elsewhere that the decision of a state agency to close a bank and the decision of a State Court to approve the sale of assets by the receivership are not subject to collateral attack.

The Fourth Circuit Court of Appeals in an appeal from this court recognized the applicability of the collateral attack doctrine as to the closing of a bank in the case of *Liberty National Bank of South Carolina at Columbia v. McIntosh,* 16 F.2d 906, 909, *appeal dismissed per stipulation,* 273 U.S. 783, 47 S.Ct. 571, 71 L.Ed. 890 (1927):

The decisions of the Comptroller of the Currency [who was in a position similar to that of the State Board of Bank Control here] are not subject to collateral attack, nor is his assessment against shareholders, and the amount thereof open to review; but, on the contrary, neither the bank nor the shareholders, clearly in the absence of fraud charged and proved, are entitled to a judicial determination of any question involved in his decision either as to the solvency, the sum due creditors and the amount of assessments as ordered, such matters one and all being exclusively within the judgment and discretion of the Comptroller, and as to which he acts in a quasi judicial capacity.

Further, in *Read v. Elliott,* 94 F.2d 55, 60 (4th Cir. 1938), in an appeal from this court, the Fourth Circuit stated as follows:

But the principle that seems to be fairly deducible from the cases, when read in connection with the precise legal situation presented to the court, is that while mere irregularities in the sale may constitute good ground for refusing to confirm the sale when the objection is originally and directly made in the particular proceeding, or at least on timely appeal in the case, by an interested party who is not precluded from effectively making the objection on the grounds of waiver or estoppel, nevertheless a final judgment or decree without appeal, even though erroneous, may not be collaterally attacked in a different and subsequent proceeding, as for instance by an ejectment suit.

This court's conclusion is that the decisions of the state agency in closing the bank and appointing the receiver and the State Court's approval of the sale by the receiver of the bank's assets are not subject to collateral attack in this case. The fact that AB&T and ABTS were not parties to those proceedings does not entitle Shareholders now to make a collateral attack that ABTS and AB&T themselves could not make.

The court also concludes that the three statutes which Shareholders contend are unconstitutional under the Fourteenth Amendment of the United States Constitution are constitutional as written. Further, the court concludes that the actions taken by the State Board of Bank Control, the FDIC and Judge Singletary pursuant to these statutes were both in accordance with the provisions of such statutes and proper.

An analogous situation that developed less than a month after AB&T closed involved the closing by the Comptroller of the Currency of Franklin National Bank. It should be noted that in this case we are dealing with state law, while in the case of *Franklin National Bank* the court was dealing with national banking laws. However, since the South Carolina Supreme Court has approved the opinion of a lower court that the State banking laws are patterned after the Federal banking laws, the same legal principles are applicable. *See Zimmerman v. Central Union Bank,* 194 S.C. 518, 8 S.E.2d 359, 363 and 365 (1940).

The late District Judge Orrin G. Judd, in considering the *Franklin National Bank* case, had this to say:

The court has been asked to give *ex parte* approval to transactions involving billions of dollars and at least two federal agencies and two large banks.

Although the court has determined that such action is proper, approval has not been given without careful consideration during the interval of more than three weeks since the first draft of the basic papers was submitted to the court for consideration.

.　　.　　.　　.　　.

The action of the Comptroller [which would be the equivalent to the actions of the State Board of Bank Control here] in making a finding of insolvency and appointing a receiver has been frequently described as discretionary and not subject to judicial review. [Citing cases]. A number of cases have said that the judgment is final unless it appears by convincing proof that the Comptroller's action was arbitrary and made in bad faith.

*In re Franklin National Bank,* 381 F.Supp. 1390, 1391–92 (E.D.N.Y.1974).

Judge Judd went on to say:

The special character of banks, and the delicate problems involved in preserving credit, justify denial of the judicial hearing which would be essential in other situations. *Slay v. Berry,* 27 Mich.App. 271, 183 N.W.2d 436, 452–53 (1970), quoting from *Fahey v. Mallonee,* 332 U.S. 245, 253, 67 S.Ct. 1552, 1556, 91 L.Ed. 2030 (1947).

.　　.　　.　　.　　.

Here the papers make a *prima facie* showing that the proposed sale of assets and the related agreements are not arbitrary, but are the best solution to a serious and delicate problem. It appears that FDIC has carefully canvassed the market, has determined that the proposed

sale of a substantial portion of the assets is the most desirable method of resolving the Bank's problems, and has invited bids from at least four qualified banks.

381 F.Supp. at 1392–93.

This exactly parallels what FDIC did in the AB&T situation. Judge Judd continued:

> The proposed agreements will protect the depositors of the Bank against loss. The Federal Reserve Bank of New York, which has granted massive assistance to Franklin for several months, is also protected against loss. The rights of creditors remain against the receiver and the assuming Bank, and do not create any obstacle to the approval of the agreement.
>
> .    .    .    .    .
>
> Any meaningful notice and hearing would defeat the expedition which is necessary in order to preserve the basic values of an insolvent bank. Both precedent and practicality therefore support the petition for *ex parte* approval.

381 F.Supp. at 1393.

The Third Circuit Court of Appeals, in *Greater Delaware Valley Federal Savings & Loan Association v. Federal Home Loan Bank Board,* 262 F.2d 371, 373 (3rd Cir. 1958), a well-reasoned opinion written by Chief Judge Hastie, stated:

> It is now settled that such an administrative taking over of a savings and loan association by the parent Board without provision or opportunity for advance litigation of the propriety of the seizure is constitutionally unobjectionable. *Fahey v. Mallonee,* 1947, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030. "Congress is not confined to that method of executing its policy which involves the least possible delegation of discretion to administrative officers." See *Yakus v. United States,* 1944, 321 U.S. 414, 425–426, 64 S.Ct. 660, 668, 88 L.Ed. 834.

■ The South Carolina Banking Code is a regulatory framework, not a penal code, and the legislature has broad discretion to draft regulatory legislation especially in the area of banking. *See Fahey v. Mallonee,* 332 U.S. 245, 250, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947). In statutes related to regulation of banking, highly specific language may well be inappropriate. *See Corstvet v. Bank of Deerfield,* 220 Wis. 209, 263 N.W. 687, 695 (1935).

■ Shareholders contend that Section 34–3–630, S.C.Code (1976), is unconstitutionally vague. The particular language of Section 34–3–630 which Shareholders challenge for vagueness is the phrase "on account of inability to meet the demands of its depositors". This phrase is identical to the one used by the United States Congress in the Federal Deposit Insurance Act, 12 U.S.C. Section 1821(e) (1976). The federal statute became law in 1933. South Carolina promulgated its law using the same language in 1936. Although the phrase is not defined in the South Carolina Banking Code, it is defined in the Federal Deposit Insurance Act:

> For the purposes of this chapter an insured bank shall be deemed to have been closed on account of inability to meet the demands of its depositors in any case in which it has been closed for the purpose of liquidation without adequate provision being made for payment of its depositors.

12 U.S.C. Section 1821(b) (1976).

Courts have often looked to acts of Congress which are *in pari materia* with state statutes in determining state legislative intent. *See, e. g., Moore v. Chesapeake & O. Ry. Co.,* 291 U.S. 205, 210, 54 S.Ct. 402, 78 L.Ed. 755 (1934).

Under the Federal Deposit Insurance Act, FDIC is empowered to act as receiver of a state bank only where the bank is closed on account of inability to meet the demands of its depositors as that term is defined in that Act and where such appointment is "authorized or permitted by state law." 12 U.S.C. Section 1821(e) (1976). The obvious purpose of Section 34–3–630, S.C.Code (1976), was to take full advantage of the protection provided by the Federal Deposit Insurance Act by permitting FDIC to serve as receiver in any case where the federal Act authorized FDIC to do so. Section 34–3–630 must be

construed as an authorization to the State Board and not a restriction. The state legislature incorporated the same limits which were imposed by federal law on FDIC's ability to act as receiver.

In summary, the wording, purpose, and history of the state and federal statutes lead to the conclusion that Section 34–3–630 authorizes FDIC to be appointed as receiver when a state bank has been closed "on account of inability to meet the demands of its depositors" as that phrase is defined in the Federal Deposit Insurance Act. This court finds that AB&T was closed in accordance with that definition. Therefore, even if the Shareholders could collaterally attack the factual finding of insolvency and decision of the State Board of Bank Control to close AB&T, their attack would fail.

One of the Shareholders' fundamental contentions is that AB&T could have been closed for one reason only, namely inability to meet a depositor's demand. The South Carolina banking statutes, however, suggest bases other than the failure to meet a depositor's demand upon which the State Board may close a bank. Specifically, Section 34–3–660, S.C.Code (1976), indicates that a bank may be closed in the event of its insolvency, or for other reasons set out therein.

■ The minutes of the State Board on September 20, 1974, state that AB&T was closed on account of insolvency and inability to meet the demands of its depositors. The insolvency of AB&T was manifested by its inability on September 20, 1974, to meet the demand of the FDIC for repayment of a $9,000,000.00 promissory note payable on demand. This failure by itself justified the closure of AB&T on the grounds of its insolvency. Equitable insolvency is the inability to meet obligations as they fall due in the ordinary course of business. That meaning commonly is ascribed to the term "insolvency" as used in banking statutes. See Annot., 85 A.L.R. 811 (1933). It is also noteworthy that the same definition is applied in the South Carolina Business Corporation Act of 1962, Sections 33–1–10–25–90, S.C.Code (1976). See Section 33–1–20(s).

The South Carolina Supreme Court has not had occasion to rule on the meaning of insolvency as used in the present banking statutes. However, in 1908, prior to the current statutes, the South Carolina Supreme Court noted the following definition of insolvency: "A bank is insolvent when, from the uncertainty of being able to realize on its assets, in a reasonable time, a sufficient amount to meet its liabilities, it becomes necessary for the control of its affairs to pass out of its hands." *Livingstain v. Columbia Banking & Trust Co.,* 81 S.C. 244, 62 S.E. 249, 252 (1908). This language more closely comports with the concept of equitable insolvency, as set out above, than with a bankruptcy or balance sheet definition of insolvency.

In this case, the evidence was conclusive that even absent FDIC's demand upon AB&T on September 20, 1974, AB&T could not have continued for long to meet the demands of depositors and other creditors, because AB&T already had used its liquid and convertible assets to meet depositors' demands during August and September and had borrowed all the money it could borrow. Furthermore, it was apparent that in the immediate future there would have been further depositor withdrawals which AB&T could not have honored even if FDIC had not made demand. Moreover, given the losses sustained or estimated on loans purchased by FDIC from the receivership, this court finds that AB&T's liabilities exceeded the true value of its assets on September 20, 1974. Thus, whether "insolvency" under Section 34–3–660 be defined as equitable insolvency or bankruptcy insolvency, the term properly describes the condition of AB&T on September 20, 1974.

■ The State Board's finding as reflected in its minutes of September 20, 1974, was that AB&T was insolvent. This Court is convinced of the correctness of that finding. In any event, the decision of the State Board to close AB&T and appoint FDIC as receiver could not be overturned unless the State Board abused its discretion. There were certain reasonable grounds for the determination by the State Board that

AB&T should be closed on account of insolvency and inability to meet the demands of its depositors. This court is well aware that such bank boards normally are vested with broad discretionary power in dealing with statutes related to the closing and liquidation of banks.

Based upon the foregoing, the court concludes that the Shareholders have utterly failed to make out any case upon which this court could grant them relief.

 The court further concludes that the Shareholders' claims against the assets of AB&T, like those of the subordinated capital noteholders, are subordinated and inferior to the claims of general creditors of AB&T, including the claims of FDIC, the corporation, against former AB&T officers and directors and their liability insurance coverage.

For that reason, the court stays the Shareholders' suits and will not permit them to proceed to trial on their derivative causes of action.

Again, as it did in 1976, the court concludes that FDIC is the owner of all derivative causes of action, including causes of action for harm done by employees, officers, and directors of AB&T and ABTS.

FDIC, representing itself as the creditor, and also representing the general creditors of AB&T, is directed to pursue all proper causes of action against such employees, officers, and directors, as soon as reasonably practicable. All other causes of action against the same officers and directors are stayed until the further Order of this court.

The Schein defendants are the owners of the capital notes of AB&T. They were in April of 1976, and are now, authorized to proceed to judgment at any time against AB&T's receiver insofar as those notes are concerned.

The court further finds that the Schein defendants own personally any action for alleged fraud and deceit against the officers and directors of AB&T and ABTS arising in connection with the purchase of such subordinated capital notes. But they shall not proceed to trial in that particular action until further order of the court.

The court also concludes, as it did in April of 1976, that the Shareholders are the owners of all causes of action based upon alleged Federal Securities Laws violations, with the exception of any claim based upon Section 16(b) of the Securities Exchange Act of 1934. However, the Shareholders shall not proceed to trial with any such claims until further Order of this court.

AND IT IS SO ORDERED.